1               UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4  UNITED STATES OF AMERICA       ) Docket Number
                        ) 1:20-CR-452-SDG-CCB
5                      )
                      )
6          v.            )
                      )
7                      ) Atlanta, Georgia
                      ) January 12, 2021
8  VIDA MESSIAH JONES           )
                      )
9                      )

10

11       TRANSCRIPT OF RECORDED DETENTION HEARING
       BEFORE THE HONORABLE LINDA T. WALKER
12        UNITED STATES MAGISTRATE JUDGE

13

14  APPEARANCES OF COUNSEL:

15

   For the Government:      MR. RYAN BUCHANAN
16                   MR. BRET HOBSON

17

   For the Defendant:       MS. MILLIE DUNN
18

19

   Official Court Reporter:   ALICIA B. BAGLEY, RMR, CRR
20

21  Proceedings recorded by mechanical stenography, transcript
            produced by computer
22

23

24

25

1                          I N D E X

2


3       FOR THE GOVERNMENT:

4       STEPHANIE BENNETT

5               Direct Examination by Mr. Buchanan          8
                Voir Dire Examination by Ms. Dunn          10
6               Cont. Direct Examination by Mr. Buchanan   11
                Cross-Examination by Ms. Dunn              12
7               Redirect Examination by Mr. Buchanan       15
                Recross-Examination by Ms. Dunn            15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         P R O C E E D I N G S

 2                    (in Atlanta, Fulton County, Georgia;

 3                    January 12, 2021; defendant present)

 4                    THE COURT:  Please be seated.  Good morning.

 5                    MS. DUNN:  Good morning.

 6                    MR. BUCHANAN:  Good morning.

 7                    THE COURT:  Okay.  The Court calls the case of United

 8       States of America vs. Vida Messiah Jones.  This is Case Number

 9       1:20-CR-452.  We have appearing on behalf of the government Ryan

10       Buchanan and on behalf of the defendant we have Millie Dunn

11       sitting in for Rebecca Shepard.  Is the government ready to

12       proceed?

13                    MR. BUCHANAN:  Yes, Your Honor.

14                    THE COURT:  Is the defendant ready to proceed?

15                    MS. DUNN:  Yes, ma'am.

16                    THE COURT:  Okay.  Ms. Dunn, you may proceed at this

17       time.

18                    MS. DUNN:  Your Honor, I would ask Your Honor to

19       impose a bond.  I don't know if the government intends to put up

20       evidence or a witness, but based on pretrial services' report it

21       certainly seems like the government's case deals with a very

22       finite, short period of time and what is a very short period of

23       time for even this young man.  He was 18 years old.  Around the

24       time of these incidents, he had just graduated from high school.

25                         My understanding is there are no physical victims, no
```

1    person was involved in any of this conduct, that it all has to do

2    with property, and I think that there are conditions under the

3    circumstances of this case that Your Honor could impose with

4    which would make sure the likelihood of anything happening is

5    zero.

6             For instance, as probation recommended, there is the

7    possibility of electronic monitoring.  Your Honor could do the

8    old-fashioned landline or you could do GPS.  You could do a

9    curfew.  You could do absolute must stay at home, cannot work.

10   You could allow him to work.  So there are lots of options that

11   Your Honor could employ if you're concerned about this behavior.

12   But I think in a case with someone this young with no criminal

13   history whatsoever, no marks on his record, and a recent graduate

14   from high school, allowing him to go back home and live with his

15   mother would be the most appropriate thing.

16            THE COURT:  I'm sorry, Ms. Dunn.  That was one of the

17   concerns was -- probably one of the major concerns at the time is

18   that his living situation -- I think his mother was living with

19   someone and maybe one of the codefendants was also living at that

20   residence or had been residing there, I'm not sure.  I'm going on

21   memory here.  But the homeowner indicated that he could not come

22   back there.  So where would he be living if the Court was able to

23   fashion conditions that would ensure that he is not a risk of

24   flight or a potential threat to the safety of the community,

25   where would he be residing?

1          MS. DUNN:  He would be residing with his mother and

2     what I understand -- and of course I wasn't involved in the case

3     back then.  But what I understand happened was his mother was

4     living -- and they have roommates.  The roommates had absolutely

5     nothing to do with this case and we're not focusing on them.

6          THE COURT:  All right.

7          MS. DUNN:  But they felt uncomfortable about the

8     allegations that were made and she was afraid that he would not

9     be allowed to come back there and that she would be dispossessed.

10    She in fact was not dispossessed.  However, she chose to move so

11    she has a new address at 1250 Oakland Terrace, Southwest.  It's a

12    three-bedroom house and Mr. Jones would have his own bedroom.  So

13    she is here in the courtroom as are other people who are here in

14    support of him.  So he has a stable residence.  His mother is

15    here showing support, will help the Court with any condition that

16    you impose, she wants him to come home while he prepares for

17    trial on this case.

18         THE COURT:  Let me hear from Mr. Buchanan.  Thank

19    you, Ms. Dunn.

20         MR. BUCHANAN:  Thank you, Judge.  As we have outlined

21    in our motion, we don't believe that there's a set of conditions

22    or a condition to reasonably assure Mr. Jones' appearance or the

23    safety of the community.  I lean a little bit more on the safety

24    prong with respect to Mr. Jones.  Ms. Dunn is absolutely correct,

25    he is a young person.  He is a young person without a criminal

1    history, but he sort of jumped into the thick of it very, very

2    quickly, Your Honor.

3            The Court is aware of the facts.  Mr. Jones' mother,

4    two codefendants, burned five postal trucks over the course of a

5    night and Mr. Jones is identified in that by surveillance by the

6    purchase of a gas can at a gas station.

7            And then, Your Honor, in addition to that, he's

8    also noted -- we noted in the complaint affidavit some statements

9    that were made by an Instagram account lent to him prior to this

10   attempt which took place in October.  This Instagram account

11   posted "The only shit to be f'd up there would be pig wagons if

12   they decide to show.  The rally is to garner more support for the

13   movement and hopefully more numbers by 9:00 p.m."  Later he said,

14   "At 9:00 we'll march to F shit up."

15           After the attack -- after the postal cars were

16   burned, October 5th of 2020, "Post office vehicles got torched at

17   the West End police office, a MARTA cop car, an F'd up West End

18   station, city vehicles at East Point City Hall hit multiple

19   times.  You can start by blowing up federal and government

20   nuisances."  So those are essentially confessions with respect to

21   what happened overnight during those first couple of days of

22   October.

23           October 12th he says "I'm forming a hit squad to F

24   shit up around Atlanta.  The 19th recruiting is starting.  I may

25   put together a black roads (phonetic) agenda on security team.

1   We need folks that are carrying or know how to be searchable

2   within arms.  We make plans and move on November 1st," just a

3   couple of days before the presidential election.

4             So, Your Honor, I want to sort of dispel the Court of

5   this notion that perhaps Mr. Jones' involvement was less

6   important as it's depicted in the criminal complaint and the

7   subsequent indictment, because he was actively involved.  These

8   communications show that he was at least attempting to assume -

9   sometimes he said "I plan to put together" - some type of

10  leadership role.  That's with respect to these postal fires that

11  happened in October.

12            Prior to that, Your Honor's familiar with the charges

13  that have been filed against Richard Hunsinger.  The Court held

14  Mr. Hunsinger's preliminary detention hearing as well.  That

15  involved damage and vandalism and a subsequent federal assault

16  charge related to the DHS building which is located at 180 Ted

17  Turner, right down the street from here.  Your Honor, we have

18  reviewed the surveillance from that and found a person who

19  appears to be Mr. Jones throwing items into the DHS building.

20  I'll provide Ms. Dunn with copies of what I've marked as

21  Government's Exhibits 1 and 2.  I'd move for their admission into

22  evidence.

23            THE COURT:  Any objection?

24            MS. DUNN:  I actually do object to them without

25  testimony about where they came from, what they are, or how

 1  they're connected with Mr. Jones.

 2          THE COURT:  Mr. Buchanan.

 3          MR. BUCHANAN:  I can call an agent if that's what we

 4  need to do.

 5          THE COURT:  Okay.  That's fine.

 6          MR. BUCHANAN:  The United States calls FBI Special

 7  Agent Stephanie Bennett.

 8          THE COURT:  Okay.

 9              (the witness was sworn)

10          THE CLERK:  You can take a seat and if you would

11  please state your name for the record and spell your last name,

12  please.

13          THE WITNESS:  Stephanie Alexis Bennett,

14  B-E-N-N-E-T-T.

15          THE CLERK:  Thank you, ma'am.

16                   DIRECT EXAMINATION

17  BY MR. BUCHANAN:

18  Q.   Special Agent Bennett, how are you employed?

19  A.   I'm a Special Agent with the FBI.

20  Q.   And how long have you been with the FBI?

21  A.   Since 2018.

22  Q.   And what types of cases do you work on?

23  A.   I work on the Joint Terrorism Task Force.

24  Q.   Do you do more domestic terrorism work or international

25  terrorism work?

1   A.   Domestic terrorism.

2   Q.   During the course of your work have you become familiar

3   with Mr. Jones?

4   A.   I have.

5   Q.   Do you see Mr. Jones here in court?

6   A.   I do.

7   Q.   In fact, were you present when Mr. Jones was arrested?

8   A.   I was.

9   Q.   Special Agent Bennett, I'm going to hand you what I've

10  marked as two exhibits, Government's Exhibits 1 and 2.  I'm

11  going to ask you kind of what they are.  Special Agent

12  Bennett, during the course of your work have you participated

13  in the investigation involving vandalism and assault that

14  occurred at the DHS building on January 25th, 2020 --

15  July 25th, 2020?

16  A.   I did.

17  Q.   That activity that took place at the DHS building, was

18  it captured by surveillance?

19  A.   It was.  There were, I believe, over 10 cameras surrounding

20  that building.

21  Q.   And have you had an opportunity during the course of

22  your work to review some of that surveillance?

23  A.   I did.

24  Q.   And can you please tell Judge Walker what is depicted --

25  whether or not you're familiar with what's depicted in

1    Government's Exhibits 1 and 2.

2    A.    I am.    These appear to be from the camera that was located

3    at the very front entrance of the building and Exhibit 1 is two

4    individuals and Number 2 is the same individual that's on the

5    top right-hand corner of Exhibit 1.

6    Q.    Based on your review of the surveillance, do

7    Government's Exhibits 1 and 2 appear to be fair and accurate

8    screen grabs from that surveillance?

9    A.    It does.

10            MR. BUCHANAN:    Your Honor, we'd move for the

11    admission of Government's Exhibits 1 and 2 into evidence.

12            THE COURT:    Any objection, Ms. Dunn?

13            MS. DUNN:    May I *voir dire*?

14            THE COURT:    Sure.

15                    VOIR DIRE EXAMINATION

16    BY MS. DUNN:

17    Q.    I received some images from Mr. Buchanan which had a lot

18    more information in them.    What you have in front of you,

19    have those somehow been modified from the original?

20    A.    What's the question?

21    Q.    Where did you get those pictures?

22    A.    These are screen shots of a video.

23    Q.    So you watched the video and you took screen shots?

24    A.    I took screen shots.    Some of my colleagues on the task

25    force also took screen shots.

1    Q.    Is the image that we see in the picture the full screen

2    shot or just a screen shot of a small portion of what you

3    would see on the screen?

4    A.    These appear to be zoomed-in images of that.  I believe the

5    angle's a little bit wider.

6    Q.    So there are other things in the photograph other than

7    what you all have decided to capture in those small screen

8    shots?

9    A.    The video would show more outer images than the zoomed-in

10   portion.

11   Q.    So that's yes?

12   A.    Yes.

13            MS. DUNN:  I object.  I think they've been modified

14   and we don't know exactly what the whole picture is without

15   seeing the entire photograph.

16            THE COURT:  Defendant's objection is overruled.

17   Exhibits 1 and 2 are admitted.

18                   CONTINUED DIRECT EXAMINATION

19   BY MR. BUCHANAN:

20   Q.    Special Agent Bennett, in addition to this surveillance

21   did the FBI also conduct a forensic analysis of some of the

22   items that were found in and around the DHS building?

23   A.    Yes.

24   Q.    And do any of those items relate to Mr. Jones?

25   A.    They do.

1    Q.   Please tell Judge Walker what type of item and relation

2    it has to Mr. Jones.

3    A.   One of the several items that was found inside the building

4    was a round metal disk which was later determined to be a trash

5    can lid and the FBI laboratory in Quantico, Virginia notified us

6    that a blood DNA sample on that lid result back to Mr. Jones.

7             MR. BUCHANAN:  I have nothing else for this witness,

8    Your Honor.

9             THE COURT:  Okay.  Any questions of this witness, Ms.

10   Dunn?  Do you have any questions of this witness?

11            MS. DUNN:  Oh, yes, ma'am.

12            THE COURT:  Okay.

13                      CROSS-EXAMINATION

14   BY MS. DUNN:

15   Q.   So you don't know if the person in that photograph is

16   Mr. Jones?

17   A.   I can't say definitively.  It has the appearance of

18   Mr. Jones.

19   Q.   You can't say that's Mr. Jones?

20   A.   It has the appearance of Mr. Jones.

21   Q.   What you can say is there was an item found on a trash

22   can lid inside the building that had blood on it?

23   A.   Yes.

24   Q.   And that that blood, you say, Quantico says -- did they

25   say it belonged to Mr. Jones?

1    A.    It matches Mr. Jones' DNA profile obtained during his

2    arrest through a cotton swab.

3    Q.    Did it match other peoples'?

4    A.    Not to my knowledge.

5    Q.    Did it have other DNA on it, the trash can lid?

6    A.    Not to my knowledge.

7    Q.    So the only DNA on the entire trash can lid was

8    Mr. Jones' according to your testimony?

9    A.    I can't say that because I'm not in the lab and so I didn't

10   process that item, but I was informed that Mr. Jones' DNA was

11   found on the lid.

12   Q.    Okay.  And you were informed from someone in the lab at

13   Quantico?

14   A.    That's correct.

15   Q.    Have you received the report yet?

16   A.    It's possibly in the file.  I don't have it with me at this

17   time.

18   Q.    Do you remember reviewing it?

19   A.    One of my colleagues did.

20   Q.    Okay.  Did the report or the person you talked with or a

21   colleague, if that's where you got your information, tell you

22   how long that blood had been on the trash can lid?

23   A.    They did not.

24   Q.    Could it have been on there a month?

25   A.    I don't know.

1    Q.    Now, the DHS building is the building downtown; correct?

2    A.    That's correct.

3    Q.    And the trash can lid, do we know where that came from?

4    A.    I believe it was an item that was inside the fence, the

5    individual appears to pick it up from there and toss it in

6    through the front, but I don't know the exact location of the

7    trash bin.

8    Q.    Okay.  Do other people in the world have access to that

9    trash can prior to July 25th or whatever the date was?

10   A.    I'm sure they do.

11   Q.    So DHS is downtown; yes?

12   A.    I'm sorry?

13   Q.    DHS is downtown?

14   A.    That's correct.

15   Q.    In an area where many people travel by?

16   A.    Yes.

17   Q.    Where people may pick up the trash can lid and put trash

18   inside of a trash can?

19   A.    I believe that's what they do.

20   Q.    So we're still talking about this occurring July 25th

21   and the postal issues happening early, early October; right?

22   A.    That's correct.

23   Q.    So we're talking about a three-month period; correct?

24   A.    That's correct.

25              MS. DUNN:  That's all the questions I have.

 1            THE COURT:  Okay.  Any other questions of this

 2    witness, Mr. Buchanan?

 3                      REDIRECT EXAMINATION

 4    BY MR. BUCHANAN:

 5    Q.    Special Agent Bennett, those two pictures, Government's

 6    Exhibits 1 and 2, the one that has just one individual in

 7    it --

 8    A.    Yes.

 9    Q.    Is there anything distinctive about what that person is

10    wearing in that picture based on your investigation?

11    A.    There's several items, but one in particular is the wallet

12    chain hanging from this individual, which Mr. Jones had on him

13    the night that he was arrested.

14            MR. BUCHANAN:  No more questions, Your Honor.

15            THE COURT:  Okay.

16            MS. DUNN:  May I see the photo?

17            THE COURT:  Sure.  And then the Court would like you

18    to publish it to the Court, too.

19                     RECROSS-EXAMINATION

20    BY MS. DUNN:

21    Q.    I'm showing you Exhibit 2.  I'm trying not to get in

22    your personal space, I'm sorry.

23    A.    That's fine.

24    Q.    What you're talking about as possibly a chain is this

25    little white mark here?

 1    A.    Yes.

 2    Q.    And you can definitively testify, based on this

 3    photograph, that that's a chain?

 4    A.    I observed it swaying when I watched and reviewed the video

 5    footage.

 6    Q.    So like if I had headphones on with a heavy headphone

 7    cord, that might sway as I move; right?

 8    A.    Sure.

 9    Q.    So that might be a headphone cord?

10    A.    It looked - it looked very similar to the chains that

11    Mr. Jones has worn on numerous occasions, including the night of

12    the arsons in October.

13    Q.    So it looks like it could be a chain that's similar to

14    something he wore three months later?

15    A.    That's correct.

16                MS. DUNN:  Gotcha.

17                THE COURT:  Any other questions?

18                MR. BUCHANAN:  No, Your Honor.

19                THE COURT:  You may step down.

20                MS. DUNN:  Do you need to publish those?  I'm looking

21    out for you, Judge Walker.

22                THE COURT:  Thank you, Ms. Dunn.

23                MS. DUNN:  Sorry for getting so close.

24                MR. BUCHANAN:  Your Honor, we'd point out, with

25    respect to that wallet chain, Paragraph 36.

1          MS. DUNN:  I object to you calling it a "wallet

2     chain."  I don't think that's necessarily consistent with the

3     testimony.

4          THE COURT:  Objection noted.  Go ahead, Mr. Buchanan.

5          MR. BUCHANAN:  The item discussed during Special

6     Agent Bennett's testimony around or near the waist of the person

7     believed to be Mr. Jones, I point out Paragraph 36 of the

8     criminal complaint affidavit that shows the picture of the person

9     was Mr. Jones buying a gas can, that chain is depicted at his

10    waist.  The Court would note from the preliminary hearing that at

11    that point Mr. Jones used a credit card that's been associated

12    with him to make that purchase and that purchase was made right

13    around the same time of the postal fires.  So that chain

14    necessarily does go back to him.  I'd also note that there's

15    essentially an admission of his activity related to the DHS

16    building in his Instagram account as well consistent with the

17    types of things that he was saying about the postal fires and the

18    other activity.

19          Your Honor, based on the facts we don't believe that

20    there's a set of conditions to assure the safety of the community

21    because Mr. Jones, although his activity is not belied by a life

22    or extensive criminal history, he got serious very, very quickly.

23    If we take these two events that occurred over a three-month

24    time, you had in July he's throwing a trash can.  Now, while it's

25    alongside Richard Hunsinger who was throwing a Molotov cocktail,

1  that's Mr. Jones' activity.  But in a short period of time he's

2  in the store buying the gas can and with Wade and Brett as they

3  set fire to postal vehicles.  So there's a very, very quick

4  escalation of his activity in a short period of time.  That

5  escalation is supported by the statements that he's made.  He's

6  held himself out to be organizing.  He's not simply a young

7  person who was following orders.  We believe that he was a leader

8  in some of this activity.

9          So for those reasons, we don't believe that there's a

10  condition or set of conditions that the Court can set to

11  reasonably assure his appearance or, and more primarily, the

12  safety of the community.  Given sort of even beyond that, Your

13  Honor, the fact that his activity is aimed at government

14  buildings, I would be asking him to submit himself to the

15  submission of a government employee and a US Probation Officer so

16  we believe that he must be detained.  Thank you.

17          THE COURT:  Thank you.  Ms. Dunn.

18          MS. DUNN:  Yes, ma'am.  Well, first of all, probation

19  is recommending a bond so they clearly don't have a concern about

20  supervising Mr. Jones.

21          There's a big difference between activity aimed at

22  government buildings and the *indicia* of government versus not

23  following conditions that Your Honor puts on him, a big

24  difference.  I mean, even some of the people who broke into the

25  capitol building are getting bonds.  People who stole podiums and

1    tried to sell them on eBay who did physical damage to that

2    building, hopefully not the ones who tried to go physically after

3    people, but that's not what we have here.  We have a trash can

4    with DNA that we don't know from where, a trash can lid.  We

5    don't know who threw it in.  We know there's a grainy picture of

6    somebody.  We don't know that it's Mr. Jones.  I don't see hair

7    that makes me think it's Mr. Jones.  There's no way to say that

8    that is Mr. Jones.  But even assuming that it is, it's a trash

9    can lid.

10             The government -- oh, and the chain.  Do you know how

11   many young men wear chains like that on their wallets?  Do you

12   know how many white supremacists wear chains like that everywhere

13   they go when they're riding their motorcycles around.  Those

14   things are all over the place.  It certainly is not a specific

15   identifiable item that comes back specifically to Mr. Jones.

16             The government's suggestion that this got serious

17   very quickly, you know, that may be.  It may be that after years

18   of watching people being treated so poorly by our federal

19   government --

20             MR. BUCHANAN:  I'll object to the relevance of this,

21   Your Honor.

22             MS. DUNN:  -- that Mr. Jones --

23             THE COURT:  I'll let her argue.  Go ahead.

24   Overruled.

25             MS. DUNN:  -- behaved in a way that he shouldn't have

behaved, that's for a jury to decide.  But we're still talking
about a very short period of time and the law says that you
should give him bond unless there are no conditions that could
protect society from him.

If he's not allowed to do anything except go to --
let's take a step back.  All of these things the government says
happened happened at night.  Keep him home at night.  Make his
mother his custodian from dawn until dusk.  No, I got that
backwards.  Dusk until dawn.  Put him on a GPS monitor.  Tell him
all he can do is work and he's only allowed to work during the
daytime.  Those are things, conditions, that would make sure that
he's not involved in this.

As for his Twitter account and those being
admissions, that is absolutely not true.  That is absolutely not
true.  Just because you say something happened and how you feel
about whether or not that happened doesn't mean you did that
thing so that's ridiculous.  But more important, he had like 12
followers on his Instagram account.  This is not a leader
inciting a group of people.  He's got 12 high school boys with
him on his Instagram account.

Yes, maybe he does want to stand up for people who
have been wronged by a system that has chronically wronged
people, and that part should be commended.  What we're here to do
is make sure that if he's released on bond, which he should be
under our statute, that he is not a danger to the community and

the conditions that Your Honor can impose certainly would keep

him from being physically able to be anywhere and do anything

that is dangerous.  Thank you.

          MR. BUCHANAN:  Just one point.  The DHS building was

occupied, that was not a property crime.  There were two officers

who were inside that building when that Molotov cocktail was

thrown in that building 2 feet away from Mr. Jones.  When he

threw that trash can into that building, it was occupied.  I just

want to rebut any idea that that was simply a property crime.

Hunsinger's been charged with assault of a federal officer and

there's a potential charge for that ultimately with Mr. Jones as

well.

          THE COURT:  Okay.  Thank you.  I got it, Ms. Dunn.

Thank you.

          Let me just say this.  I did have the codefendants

and Mr. Hunsinger during my last duty so everything I'm saying,

really, is from my memory and not that I've gone back and

reviewed those other defendants.

          What I do recall with regard to the other two

defendants that I did detain, I remember -- I don't know if it

was Brett or Wade, but I do remember one of them had a GPS

monitor that was tracking him the whole night.  But what stood

out to me, when the case came before me the first time, was both

of those guys were in their 30s.  I know one of the defendants

had a criminal record, a previous arson, and I was wondering why

1   do you have an 18-year-old hanging out with some 30 year olds.

2   He was 18, he had a job.  I thought his living situation was a

3   little transitory.  So based on that I thought he was a follower

4   when you have one person's previously convicted of arson and he's

5   hanging out with these guys at 1:00 or 2:00 o'clock in the

6   morning right out of high school, he did not have a criminal

7   record.

8          In addition to that, with regard to him, his home

9   life appeared to me - no offense to the mom - to be in flux.  He

10  stayed at a lot of different places, a lot of different times,

11  and there was some social media chatter.  But what happened

12  also -- I do know that Mr. Hunsinger, I detained him as well, he

13  threw a Molotov cocktail into the building.  However, he has

14  gotten bond.  This individual, along with the other older guys

15  that he was hanging out with, they were damaging vehicles.  I'm

16  not saying that that's any less important, but he was a little

17  different in my mind at that time because of that, because of his

18  age, because he didn't have a criminal record and because he at

19  least had a parent involved in his life.  Although the home life

20  was a little unstable.

21         So I am concerned -- I agree with you, what he has

22  done is pretty serious, but Mr. Hunsinger was more serious

23  because he actually threw a Molotov cocktail in the building.

24  This young man here a trash can, which is, you know, still

25  conduct that's not indicative of what should be social justice.

1    But nonetheless, Mr. Hunsinger was allowed to get a bond by the

2    Court.  Granted, not me, but the higher court.  So because of his

3    lack of criminal history, his youth, I do not believe that I am

4    unable to fashion conditions of release that will prevent his

5    potential threat to the safety of the community.  I don't think

6    he's a risk of flight.

7            So what I'm inclined to do is place him on house

8    arrest with active GPS monitoring.  He will not be allowed to

9    have any type of social media presence at all and I will restrict

10   his travel to the Northern District of Georgia.  He's to reside

11   with his mother and he's not going to be able to work at all.

12   So, I mean, if that's going to be a problem, speak now or forever

13   hold your peace, because normally what happens is I get a

14   modification in a couple of months that say he needs to get out

15   and work.  He will not be able to work.  He's just going to be at

16   the house.  He can only leave to meet with his attorney, court

17   appearances, and for medical emergencies.  But even with that,

18   with the exception of medical emergencies, everything else has to

19   be run by a pretrial service officer.  Let's see.  Pretrial

20   services needs to check out the address and needs to make sure --

21   the two of them are going to be the only people there?

22           MS. DUNN:  The mother's partner, I believe, also

23   lives with her.

24           THE COURT:  Okay.

25           MS. DUNN:  But it's just the three of you; correct?

1          FEMALE VOICE:  It's just the three of us.

2          THE COURT:  Okay.  He's going to be required to not

3    obtain a passport.  I believe he does not have one already;

4    correct?

5          MS. DUNN:  Correct.

6          THE COURT:  I'm going to require that he avoid all

7    contact with the codefendants in the case and they have been

8    detained so he should not be receiving any phone calls from them.

9          I'm going to require you to refrain from possessing a

10   firearm, destructive device, or other dangerous weapon.  That

11   includes ammunition.  Refrain from the use of alcohol.  He'll

12   submit to drug testing and treatment, if deemed necessary by

13   pretrial services.

14         He's going to be on home incarceration which means

15   he's restricted to the home for 24 hours locked down, again,

16   except for medical emergencies and court appearances and attorney

17   visits as pre-approved by pretrial services.  He'll be on active

18   GPS monitoring.

19         He's not to commit any local, state, or federal

20   offense while on supervised release.  His social media -- if he

21   obtains any social media accounts, anything, Instagram, Facebook,

22   whatever, Tik Tok, anything that you're on social media will be a

23   revocation of your bond.  So if pretrial needs to look at your

24   devices they may do so.

25         MS. DUNN:  Your Honor, may I ask a question?

1          THE COURT:  Sure.

2          MS. DUNN:  I understand that he cannot leave to work.

3    There are some online opportunities for work.  Understanding that

4    pretrial will have the opportunity to view and look through any

5    computer he has -- no computer?

6          THE COURT:  No.  Huh-uh, no, because he's going to

7    get himself in trouble.  I'm sorry.

8          From the government?

9          MR. BUCHANAN:  Yes.  We'd ask the Court to hold its

10   order while we appeal to the district court.

11         THE COURT:  Okay.  Not a problem.  And you'll need

12   how many days for that; three?

13         MR. BUCHANAN:  Yeah, three is plenty.

14         THE COURT:  Okay.  We'll stay the bond for three days

15   while they appeal to the district judge.  That would be Judge

16   Grimberg, I believe?

17         MR. BUCHANAN:  I believe so, Your Honor.

18         THE COURT:  Anything else on behalf of either party?

19         MS. DUNN:  No, Your Honor.

20         MR. BUCHANAN:  No, Your Honor.

21         THE COURT:  If there's nothing else in front of the

22   Court, court is in recess.

23                    (Proceedings concluded)

24

25

1

2  UNITED STATES DISTRICT COURT

3  NORTHERN DISTRICT OF GEORGIA

4  CERTIFICATE OF REPORTER

5

6       I do hereby certify that the foregoing pages are a

7  true and correct transcript of the proceedings taken down by me

8  in the case aforesaid.

9

10

11            This the 14th day of January, 2021.

12

13

14                              /S/ Alicia B. Bagley _____
                                ALICIA B. BAGLEY, RMR, CRR
15                              OFFICIAL COURT REPORTER
                                (706) 378-4017
16

17

18

19

20

21

22

23

24

25